REGINA H. MEREDITH AND CLIFFORD W. SNEDEKER, PLAINTIFFS, v. MERCER COUNTY BOARD OF CHOSEN FREEHOLDERS, DEFENDANTS.

GEORGE F. KUGLER, JR. ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, *AMICUS CURIAE*.

Superior Court of New Jersey
Law Division

Argued September 15, 1970—Decided October 1, 1970.

*Mr. Edward B. Meredith* argued the cause for plaintiffs (*Meredith, Meredith & Chase,* attorneys).

*Mr. Harvey L. Stern,* County Counsel, argued the cause for defendants.

*Mr. Dennis J. Quinn,* Deputy Attorney General, argued the cause for the amicus curiae (*Mr. George F. Kugler, Jr.,* Attorney General of the State of New Jersey).

MOORE, J. S. C. In this matter the Court is asked to interpret and determine the intent and meaning of *N. J. S. A.* 19:32–26 as it applies to the appointment of a person to fill a vacancy for an unexpired term in the office of Superintendent fo Elections for Mercer County, a second class county.

Under the authority of *N. J. S. A.* 19:32–26 Mercer County created the office of Superintendent of Elections on April 16, 1968. The resolution creating such office was filed

in the Secretary of State's office April 22, 1968 and the reso-
lution took effect on July 4, 1968 under the above statute.
The Governor of the State of New Jersey made no appoint-
ment to the office within 30 days following the effective date
of the resolution, and subsequently on August 6, 1968 the
Board of Freeholders of the County of Mercer adopted a
resolution wherein they appointed Samuel A. Naples to the
office of Superintendent of Elections for a term of five years
from said date, the five-year term being from August 7, 1968
to August 7, 1973. The resolution of appointment was filed
with the Secretary of State's office August 8, 1968. Mr.
Naples resigned from the office and submitted his resignation
to the Secretary of State effective September 1, 1970.

Subsequent to the resignation of Mr. Naples, the Board of
Freeholders provided on their agenda for their regular meet-
ing of September 1, 1970 to take up the matter of the ap-
pointment to fill the vacancy created by Mr. Naples' resigna-
tion. Prior to the commencement of the Freeholder's meet-
ing on September 1, 1970, an order to show cause was issued
by this Court restraining the Board of Freeholders from
acting on said appointment. The said restraint remains in
effect. Also subsequent to Mr. Naples' resignation the Gov-
ernor of the State of New Jersey submitted the name of an
appointee to the New Jersey State Senate for its advice and
consent.

A hearing on the order to show cause was held on Septem-
ber 4, 1970 at which time the Attorney General of the State
of New Jersey was granted the right to appear in this mat-
ter as *amicus curiae*. The argument on the order to show
cause was adjourned from September 4, 1970 and fully
heard with all parties present on September 15, 1970.

*N. J. S. A.* 19:32–26 was first adopted under the *L.*
1947, *c.* 167 and the provisions for appointment under the
statute at that time provided as follows:

The office so established shall be filled by some suitable person who
shall be nominated by the Governor with the advice and consent of the

Senate for a term of five years from the date of his appointment and until his successor is appointed and shall have qualified.

As to vacancies the statute at that time provided:

Vacancies shall be filled, for the unexpired terms only, in the same manner as original appointments are made.

The said section of Title 19 was first amended by *L.* 1949 *c.* 188. The amendment did not affect the above quoted sections of the law involving appointment or vacancies. The amendment limited the effect of the statute as to certain specified second class counties.

In 1953 there were a series of three amendments adopted and signed into law affecting this section of Title 19. The first 1953 amendment was adopted on April 15, 1953 (*L.* 1953 *c.* 84). The amendment provided authorization for certain fifth class counties to appoint a Superintendent of Elections but did not change the above quoted sections of the law. On July 20, 1953 (*L.* 1953 *c.* 246) an amendment was adopted which again made no change in the above quoted sections but provided that the population classification of the various counties would be governed by the 1950 census.

The third and last amendment made during the year 1953 was adopted on December 30, 1953 (*L.* 1953 *c.* 444) during a special session of the Legislature. There were major changes to the above quoted sections of the statute and those amendments as adopted read as follows:

The office so established shall be filled by some suitable person who shall be nominated by the Governor with the advice and consent of the Senate for a term of 5 years from the date of his appointment and until his successor is appointed and shall have qualified. In the event that no such appointment to such office is made within 30 days following the taking effect of the resolution, heretofore or hereafter adopted, of the board of chosen freeholders of the county, as herein provided, then the said board of chosen freeholders of the county shall appoint some suitable person to fill such office for a term of 5 years from the date of appointment and until the successor of such person is in the same manner appointed and shall have qualified.

The board shall file notice of such appointment in the office of the Secretary of State.

\*          \*          \*          \*          \*          \*          \*          \*

Any vacancy occurring in such office of superintendent of elections shall be filled in the same manner as the original appointment to such office was made, but for the unexpired term only.

This section of Title 19 was last amended by *L.* 1965 *c.* 153; however, the amendment only changed the portion of the statute dealing with the salary to be paid the Superintendent of Elections in the various classes of counties. It made no change to those sections quoted above of the amendments adopted on December 30, 1953.

In their arguments made to the Court the parties have presented three separate interpretations of this statute and the appointing power contained therein.

The plaintiffs interpret the meaning of the statute as follows, as it is applicable to the situation in Mercer County. Considering the statute as amended, it indicates that the Governor would, following the occurrence of a vacancy, have a period of 30 days in which to act upon the appointment of a person to fill said vacancy, and that if the Governor does not act within those 30 days then the Board of Chosen Freeholders would have the opportunity to appoint someone to fill the vacancy.

The defendant, Mercer County Board of Chosen Freeholders, interprets the statute as follows: At the time that Mercer County adopted the resolution authorizing the creation of the office of Superintendent, the then Governor of the State of New Jersey failed to or relinquished his right under the statute to make an appointment within 30 days following the effective date of the resolution. The Board then made the appointment to the office. Under such a circumstance the defendant claims that the Governor of the State of New Jersey, regardless of who he may be, is forever barred from making an appointment for the office of Superintendent of Elections of Mercer County and that the Freeholders are the parties authorized to make such appointment forever in the future.

The defendant bases its interpretation of the ordinance on two specific phrases in the statute: the first phrase contained in the third paragraph of the statute which states "The said board of chosen freeholders of the county shall appoint some suitable person to fill such office for a term of five years from the date of the appointment and until the successor of such person *is in the same manner appointed and shall have qualified.*" (Emphasis added). The second phrase on which they base their interpretation is contained in the last paragraph of the section — "Any vacancy occurring in such office of superintendent of elections shall be filled *in the same manner as the original appointment* to such office was made, but for the unexpired term only." (Emphasis added). The last paragraph above quoted is actually the section of the statute which is directly involved in this case, since any appointment to this office would be for the purpose of filling a vacancy and would be for the unexpired term only.

The Attorney General, appearing as *amicus curiae* in this matter, offers a third interpretation of the pertinent parts of the statute. The Attorney General's position is that the appointing power conferred upon the Board of Chosen Freeholders in any county establishing the office of Superintendent of Elections is limited and restricted to the first appointment made in accordance with the provision that if the Governor does not appoint within 30 days of the effective date of the resolution then the Board of Freeholders have the right to appoint. The Attorney General makes the point that the appointing power of the Board of Chosen Freeholders is limited to the first appointment by reason of the phrase "In the event that no such appointment to such office is made within 30 days following the taking effect of the resolution, heretofore or hereafter adopted, the board of chosen freeholders of the county * * *" In other words, their appointing authority is limited to that period of time after 30 days have elapsed from the taking effect of the resolution, and that any subsequent appointments to a specified term of five years or any appointment to fill any vacancy occurring in such office

would be made by the Governor in accordance with the first sentence of the third paragraph which states "the office so established *shall* be filled by some suitable person who *shall* be nominated by the Governor with the advice and consent of the Senate * * *." (Emphasis added). The Attorney General makes the further argument that the language of the statute is such that if the Governor of the State of New Jersey did not exercise his power of appointment on the first appointment there cannot be read into the statute an intent by the Legislature to forever bar all future Governors from making any appointment in that specific county for the office of Superintendent of Elections.

The first basic question for the Court to answer in its interpretation of this statute is the question as to whether or not the office of Superintendent of Elections in second class counties is a state office or a county office. The defendant would not concede that said office in second class counties was in fact a state office. This question was specifically answered with reference to first class counties in the case of *Keenan v. Essex County Bd. of Chosen Freeholders,* 101 *N. J. Super.* 495 (Law Div. 1968), aff'd, 106 *N. J. Super.* 312 (App. Div. 1969). The lower court in the above case cited *McDonald v. Bd. of Chosen Freeholders Hudson County,* 99 *N. J. L.* 393 (E. & A. 1924) as articulating the philosophy as to why the office of Superintendent of Elections in first class counties should be considered a state office and this reasoning and disposition was adopted by the appellate court in its decision. In quoting from the *McDonald* case the lower court said:

'The answer to this contention is contained in the opinion of the Supreme Court in the original litigation between these parties relating to this subject-matter. It is there pointed out that the purpose of the statute is to provide for honest elections in counties of the first class; *that it is a matter of the gravest importance to the people of the whole state that elections should be fairly and honestly conducted in every county of the state;* that it is a matter of common knowledge that in sparsely settled districts it is not necessary to provide expensive machinery in order to procure an honest expression of the

popular will at the polls; that there is no need in such districts of that vigilance, supervision or regulation which is required in densely populated municipalities; that, consequently, where a necessity arises to add to the machinery of government additional machinery in certain localities for the purpose of attaining purity in general elections, it is within the legislative power to supply such machinery without burdening other localities, which are not in need of it, with the expense of such machinery; and that the Legislature was the sole judge whether the necessity existed in Essex and Hudson counties by reason of their crowded districts and large population; and that its decision in that regard is not open to question. 98 *N. J. L.* 386. *The purpose of the statute, as is indicated by the above statement, was to protect our citizens, no matter in what part of the state they might live, from being deprived of or injured in the enjoyment of their rights as voters by the corruption of the ballot box in Hudson or in Essex County; and an act which undertakes to do this* — that is, to provide for the purity of elections in the state by making it difficult to put into execution a scheme for the corruption of the ballot box in any part thereof, and so partially destroy the value of the franchise of every voter in the state — *is an act passed for the benefit of the whole state, and not one which merely regulates the internal affairs of the counties in which the act is made operative.*' (at pp. 397, 398; emphasis supplied)

In support of the position that the office is a state office, the court's indication in three cases is noted below, and specifically in the *Keenan* case, in addition to the powers and duties of the Superintendent of Elections set forth in the Law Division's decision in this case, the Appellate Court noted two further considerations tending to support the conclusion that the office was a state office.

First, the superintendent of elections is empowered, by statute to obtain the use of State Police troopers on election day to aid him 'in the enforcement of the election laws of this state.' *N. J. S. A.* 53:2–1. Second, the status of the superintendent as a state officer has been recognized in *Allan v. Durand,* 137 *N. J. L.* 30, 33 (Sup. Ct. 1948) (the budgetary affairs of the superintendent are subject to the scrutiny of the State Auditor and the removal of the superintendent for malfeasance is within the executive power of the Governor), and *MacPhail v. Board of Chosen Freeholders of Hudson Cty,* 6 *N. J. Super* 613, 617–619 (Law Div. 1950) (although their salaries are paid by the county, employees of the superintendent are 'state employees'). 106 *N. J. Super.,* at 315.

It is equally obvious that the expenditures to which that responsibility attached were only those within the official's ability to control. One superintendent and commissioner has been removed by the

Governor for malfeasance in office in over expending the statutory limits. *Allan v. Durand*, 137 *N. J. L.* 30 (Sup. Ct. 1948).

. . . . . . .

This legislative plan, however, was not devised to set the employees of these offices in a class apart from other employees similarly situated. The offices were created and made largely free of county supervision for reasons related entirely to the conduct of the election process. *See McDonald v. Board of Chosen Freeholders, etc.,* 99 *N. J. L.* 393 (E. & A. 1924). *MacPhail v. Board of Chosen Freeholders Hudson Cty.,* 6 *N. J. Super.* 613, at 621 (Law Div. 1950)

This Court cannot find any plausible reason as to why the philosophy of *McDonald* should not be applicable to all counties regardless of their classification, and under the circumstances I would find that the person holding the office of Superintendent of Elections in Mercer County is an officer of the State Government.

As is indicated above, there were three separate amendments to this statute in the year 1953 and the last amendment of that year (*L.* 1953, *c.* 444) was passed during a special session of the Legislature. It should also be noted that at this same time, which was December 30, 1953, the then Governor, Alfred E. Driscoll, was completing his last term of office and he, as well as the Legislature, was completing his term and session respectively. The Governor's term expired on January 19, 1954 and Governor Robert B. Meyner assumed the office of Governor on that date.

It is interesting to note that the only counties that qualified under this statute in accordance with the population requirements were the second class counties of Mercer, Passaic and Middlesex and the fifth class county of Monmouth. According to the records of the Secretary of State's office, the County of Middlesex has filed no resolution indicating that that county has established the office of Superintendent of Elections. The County of Monmouth, according to the Secretary of State's office, established the office of Superintendent of Elections in April, 1953, which was before the adoption of the statute containing the authority for the board to appoint the Superintendent of Elections. As indicated above, the County of Mercer did not establish the

office until 1968. The records of the Secretary of State's office regarding Passaic County indicate that there is a resolution on file as of the latter part of January, 1954 to the effect that the Board of Freeholders made an appointment to the office of Superintendent of Elections for that county for a term of five years commencing January 21, 1954. The resolution is dated January 20, 1954. No record of the resolution creating the office in Passaic County was made available to this Court and upon request, no copy of the resolution creating the office was supplied by the County of Passaic. The only resloution provided from either source was the resolution of appointment referred to above. It has also been noted by the Court that the statute change made by *L.* 1953, *c.* 444, approved December 30, 1953, was introduced in the Legislature by the representatives of Passaic County. Without in any way intending to rule on the question, the lack of a resolution creating the office in Passaic County and the failure of any such resolution being filed in the Secretary of State's office, creates a serious question as to the validity of the office in that county, and also creates the question as to whether the Governor at the time of the appointment to the office in Passaic County was aware that the office had even been created. In his brief to this Court, the attorney for the defendant attached as Exhibit A an opinion of the Passaic County Counsel regarding the power of the Board to appoint. However, in view of the lack of information regarding the creation of that office in that county, the opinion carries little weight. The change in the law was made on December 30, 1953 at the instigation of representatives of Passaic County and there was an appointment to that office in Passaic County within 22 days after the approval of the amendment to that statute. This is completely contrary to the amendment, which provides:

The board of chosen freeholders shall file a certified copy of such resolution, attested by the director and clerk of the board, in the office of the Secretary of State within 10 days after the adoption of the resolution, and the resolution shall take effect at the expiration of

30 days after the next primary election for the general election, or the next general election, after the adoption of such resolution, whichever shall occur first. * * *

In the event that no such appointment to such office is made within 30 days * * * then the said board of chosen freeholders in the county shall appoint * * *

It is from these facts apparent that the Legislature had some special reason for the adoption of these changes in the statute, or some special intent when they adopted the same; however, the Court has been unable to find any official reasons or intentions of the Legislature.

When the Court does not have available to it the reasons or intentions of the Legislature when adopting a specific piece of legislation, the Court must derive the intent of the Legislature from a view of the whole and of every part of the statute to make sense out of the legislation.

Since ascertainment of intent is necessarily a matter of reconstruction and has elements of fiction in it, a court's realistic approach should be, as a learned contemporary scholar phrases it, to try 'to make sense out of the legislation, so far as text and context may allow.' *Llewellyn, The Common Law Tradition: Deciding Appeals* 529 (1960). *Clifton v. Zweir* 36 *N. J.* 309, 323 (1962).

It is an established rule in the exposition of statutes that the intention of the Legislature is to be derived from a view of the whole and of every part of the statute, taken and compared together. The real intention, when ascertained, will prevail over the literal sense of terms. When words are not explicit the intention is to be collected from the context and the occasion and the necessity of the law and from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant to reason and good discretion. *In re Merrill*, 88 *N. J. Eq.* 261, 273. *Lynch v. Long Branch*, 111 *N. J. L.* 148 (Sup. Ct. 1933).

In attempting to make sense out of the legislation so far as the context may allow as stated in the above quote, the Court must reject the interpretations propounded by both the plaintiffs and the defendant and accept the interpretation propounded by the Attorney General since this latter interpretation would make sense out of the legislation and would be a more plausible and meaningful interpretation of the statute.

The Court in reaching its conclusion to adopt the interpretation of the Attorney General, also considered the opinion of the Supreme Court in *Richmond v. Ligham*, 22 *N. J.* 40 (1956):

When the constitutional delegates assembled during the summer of 1947 they were determined to create a living document embodying their high concepts of democratic government for themselves and on-coming generations. They wanted to provide for three truly strong though independent branches with adequate checks and balances. And they sought to avoid pitfalls which resulted from many of the minutely detailed provisions in the State's ancient Constitution by replacing them with general expressions of governmental principles which they believed to be well-grounded. One of these salutary principles is to be found in their prohibition of all appointments by the Legislature of executive, administrative and judicial officers; and if our courts are to keep faith with the delegates and the people of the State who overwhelmingly approved their efforts, they must be alert to this as well as the other constitutional interdictions and must be prepared to strike down subtle as well as patent departures. (at 58).

While this case is not on point, the case did discuss the fact that the Legislature is not authorized under the Constitution to make direct appointment of executive and administrative officers by statutes approved by the Governor or passed by Legislature over the Governor's veto, and the rationale of the case in that regard is pertinent to the matter of interpretation of this statute. Of course, it was pointed out that the Legislature does have the authority to authorize the appointment of administrative officers by specific individuals or officers of the state government, but in doing so the Legislature has always been very specific as to who has the appointing authority, such as *N. J. S. A.* 18A:6–34, State Board of Examiners is appointed by the Commissioner of Education; *N. J. S. A.* 18A:7–1, County Superintendent of Education is appointed by the Commissioner of Education; *N. J. S. A.* 39:2–4, Deputy Director of Motor Vehicles is appointed by the Director; *N. J. S. A.* 39:3–3, Registration and Licensing Agents are appointed by the Director of Motor Vehicles; and *N. J. S. A.* 52:17A–6, Assistants and Deputies of the Attorney General are appointed by the Attorney General.

If the statute were to be interpreted as suggested by either the defendant or the plaintiffs, the Legislature would be providing for the appointment of a state office by someone other than the Governor in somewhat less than a specific manner, in fact, in a rather hazy and uncertain manner. Thus, an interpretation suggested by the plaintiffs and defendant would be contrary to the spirit of the philosophy set forth in the *Richmond* case. It would also appear to the Court that the Governor at the time these amendments were signed could not have possibly been aware, by reason of the wording in the statute, that by his inaction for a period of 30 days he would be relinquishing forever the power of himself or any future governor to nominate a Superintendent of Elections in a county where he did not originally exercise his right to so appoint.

In the case of *Marvel v. Camden County,* 137 *N. J. L.* 47 (E. & A. 1947) the Court indicated a broad interpretation of the phrase "in the same manner" and the Court in this case would also ascribe to those words a broad intent and a sensible intent, and the Court would thus find that the use of the words "filled in the same manner as the original appointment" that appear in the final paragraph of this statute refer back to the manner in which an appointment to such a position "shall be filled by some suitable person who shall be nominated by the Governor with the advice and consent of the Senate * * *" The Court further finds that the appointive power of the Board of Freeholders exists only on the first occasion after the adoption of the resolution if the Governor does not exercise his rights of appointment within the 30 day period. If the Governor of the State relinquishes his rights to make an appointment within 30 days following the taking effect of the resolution and then the Board of Freeholders exercised its right to appoint, any future appointments or any vacancies thereafter shall be filled by the Governor of the State with the advice and consent of the Senate.

Judgment will be submitted by the attorney for the plaintiffs within 10 days in accordance with *R.* 4:42–1.